ARCELLUS SYKES v. THE PURE FOOD CIDER COMPANY, W. A. CLINITE, President, W. A. CLINITE, M. C. ALBROOK, Appellants.

**Corporations:** SALE OF STOCK: STATUTES: FALSE REPRESENTATIONS.
1 Under the present statutes relating to incorporation and requiring payment in cash for all stock issued, unless the executive council shall grant leave to accept property in payment therefor, and the filing of a verified statement of the amount issued, date, etc., the issuance of stock is a representation by the subscribing offi-

cers that the corporation had received its par value, and will support an action to recover money paid for stock in reliance upon the representation.

**Same:** FRAUDULENT ISSUANCE OF STOCK: LIABILITY OF OFFICERS. From the authentication and issuance of corporate stock knowing that it contained false statements, it will be inferred that the officers acted with intent to defraud, not only purchasers dealing directly with them for the stock, but all who purchase the same in reliance upon the representations contained therein and who are damaged thereby.

*Appeal from Polk District Court.*—HON. WILLIAM H. McHENRY, Judge.

SATURDAY, NOVEMBER 16, 1912.

ACTION for the purchase price of capital stock illegally issued resulted in judgment as prayed. The defendants appeal.—*Affirmed.*

*John C. De Mar* and *Sullivan & Sullivan,* for appellants.

*W. C. Strock,* for appellee.

LADD, J.—On the 27th day of April, 1909, E. H. Lundy sold the property, business, and good will of the Pure Food Cider Company, located at Eldora, in the name of which he appears to have been engaged in the manufacture and sale of certain soft drinks, to M. G. Albrook and W. A. Clinite for a consideration designated $8,000; each undertaking to pay one-half of this sum. The negotiations were through Albrook, and articles of incorporation, previously prepared by him, were signed by the purchasers. These fixed the capital stock at $20,000, divided in shares of $100 each, reciting that "eighty shares shall be fully paid up at the time of the commencement of business;" that the principal place of business "shall be at the city

of Des Moines;" that until the first meeting of stockholders Clinite shall be president and treasurer and Albrook vice-president and secretary of the corporation; and that these shall constitute the board of directors with the privilege of electing another stockholder as director at any time. Thereupon certificates of shares of capital stock, signed by Clinite as president and Albrook as secretary, were issued, eighty shares to each, and on each certificate was printed these words: "One hundred percent of the face value of this certificate has been paid for to the company in cash." But not a dollar had been so paid, nor had leave been obtained from or granted by the executive council of the state to issue capital stock in consideration of property. Bogus checks were signed by Clinite at Albrook's suggestion, and passed through the bank where the company did business to so "balance" its account as to indicate that cash had reached the bank to the company's credit in an amount equal to the stock issued. About fifteen or twenty days later, Arcellus Sykes, a farmer from Ida county, who had moved to Des Moines, in looking for an investment, was informed by a stockholder that he thought Clinite would sell some of this stock, and knew Albrook would. He called on Clinite, who informed him that none of his stock was for sale, but said that Albrook might sell some, and stated to him that $16,000 in stock had been issued, all of which was fully paid and equally divided between himself and Albrook, and that the company had been incorporated. In pursuance of an arrangement then made, Sykes returned in the evening when Albrook was present and the latter, in the presence of Clinite, repeated substantially what Clinite had said. Sykes saw Albrook several times in the next three days, and was shown the articles of incorporation, and told by him that chapter 71, Acts 32d Gen. Assem., had been complied with; and, when asked by Sykes whether the $16,000 in stock represented the consideration paid Lundy, answered "the purchase price and

money and equipment put in" since the purchase, that the bank books would show that this amount had been put in the business, and he made out this statement as indicating the property of the company:

| | |
|---|---:|
| Mdse. & Fixt. | $ 1,700 |
| Dispensaries | 4,200 |
| Accts. | 7,324 |
| New business | 3,500 |
| Bk. balance | 500 |
| | $17,224 |
| Indebt. | $   200 |

Thereupon Sykes bought of him twenty shares at par, though without knowledge of the effects of the company other than as furnished in this statement, and, as he testified, in reliance on the representation that the stock was fully paid, and the corporation duly organized June 2, 1909, was elected a director and manager of the company. He testified that in doing so he relied on Clinite's statement that the company was incorporated under the laws of Iowa, and there was $16,000 of paid-up capital. The twenty shares of stock were first assigned to Sykes by Albrook, but later new certificates with same recital thereon were issued in their stead. The property of the company was moved to Des Moines, and the business there conducted until some time in July of the same year, when Sykes discovered the truth concerning its affairs and severed his relations therewith.

The property went into the hands of a receiver and less than enough to satisfy its indebtedness was realized

1. CORPORATIONS: sale of stock: statutes: false representations.
therefrom. In this action Sykes seeks to recover the $2,000 paid for the stock with interest thereon from May 21, 1909, because of fraud alleged to have been practiced on him, and for that

the laws were not complied with in organizing the company or in issuing the stock.

The statute, in so far as material, may be set out:

Section 1.   That from and after the passage of this act no corporation organized under the laws of the state of Iowa, except building and loan associations as defined and provided for in chapter thirteen (13) title (9) of the Code, shall issue any stock or any certificate or certificates of shares of capital stock, or any substitute therefor, until the corporation has received the par value thereof.   If it is proposed to pay for said capital stock in property or in any other thing than money, the corporation proposing the same must, before issuing capital stock in any farm, apply to the executive council of the state of Iowa for leave so to do.   Such application shall state the amount of capital stock proposed to be issued for a consideration other than money, and set forth specifically the property or other thing to be received in payment for such stock.   Thereupon, it shall be the duty of the executive council to make investigation, under such rules as it may prescribe, and to ascertain the real value, of the property or other thing which the corporation is to receive for the stock; and shall enter its finding, fixing the value at which the corporation may receive the same in payment for capital stock; and no corporation shall issue capital stock for the said property or thing in a greater amount than the value so fixed and determined by the executive council.

Sec. 2.   It shall be the duty of every corporation to file a certificate under oath with the Secretary of State, within ten (10) days after the issuance of any capital stock, stating the date of issue, the amount issued, the sum received therefor, if payment be made in money, or the property or thing taken, if such be the method of payment.

Sec. 5.   Any officer, agent or representative of a corporation who violates any of the provisions hereof shall, upon conviction, be fined not less than two hundred ($200) dollars nor more than one thousand ($1,000) dollars, and be imprisoned in the county jail for not less than thirty (30) days nor more than six (6) months.

Chapter 71, Acts 32d G. A., as amended by section 4, chapter 104, Acts 33d G. A.

From the recital of facts it will be observed that the defendant and Albrook violated the above statutes in three respects: (1) In issuing certificates of capital stock before the company had received the par value thereof; (2) in issuing capital stock solely for property without first having applied to the executive council of the state for leave to do so, and without having obtained such leave, with the value of the property ascertained at which the corporation might receive the same in payment for the capital stock; and (3) in not filing a certificate with the Secretary of State within ten days after the issuance of the stock.

Under the last section of the act, each of these constitute a misdemeanor punishable by fine and imprisonment, and, of course, in the respects pointed out the officers of the company were negligent. But the action is not founded on negligence, and could not well be. *Warfield v. Clark,* 118 Iowa, 69. It is for deceit alleged to have been practiced by the defendant. That he represented the shares of stock to have been fully paid in cash, that this was false, and so known to him was fully established. Indeed, the mere issuance of certificates of stock since the enactment of chapter 71 of the Acts of the Thirty-Second General Assembly was a representation that the corporation had received par value therefor as exacted therein.

Moreover, in signing the certificates of shares, reciting that payment had been made in cash, and in participating in issuing the same, he specifically so represented. That he knew that payment had not been so made, 2. SAME: fraudulent issuance of stock: liability of officers. that not to exceed $8,000 had been paid for the property before the organization of the corporation, and that no appraisement thereof had been made by or at the instance of the executive council, although certificates of paid-up stock amounting to $16,000 was issued is not disputed. From these facts it is to be inferred that he acted with intent to defraud. *Hanson v. Kline,* 136 Iowa, 101; *Nash v. Minnesota Title Ins. Co.,*

163 Mass. 574 (40 N. E. 1039, 28 L. R. A. 753, 47 Am. St. Rep. 489).

Had plaintiff purchased the shares of stock from defendant, then there could have been no doubt as to the liability of the latter. In authenticating and issuing the certificates of stock, the defendant in connection with Albrook, as officers of the company, made the representations contained therein and implied from their issuance, "which, like the offer of a letter of credit, addressed themselves to whoever should purchase these certificates thereafter whoever he might be." Windram v. French, 151 Mass. 547 (24 N. E. 914, 8 L. R. A. 750); Bruff v. Mali, 36 N. Y. 200; First Nat. Bank v. Lanier, 11 Wall. 369 (20 L. Ed. 172); Stickel v. Atwood, 25 R. I. 456 (56 Atl. 687). Although neither in form or character negotiable instruments, stock certificates are readily transferable, and are bought and sold in the open market like other securities, and a corporation and its officers in issuing them are not only responsible to the persons dealing directly with them, but to all who deal with the stock in reliance on the representations made. It may be that defendant did not profit thereby, but this was not necessary to render him liable. His liability is predicated upon his wrongful act and the consequent injury to plaintiff. 14 Am. & Eng. Ency. of Law (2d Ed.) 153; Nash v. Minnesota Title Ins. Co., supra; Stickel v. Atwood, supra.

The damage to plaintiff in the loss of money paid to Albrook for the shares of stock was a direct consequence of the fraudulent representations in which the latter and defendant participated in issuing the certificates, and we are unable to discover any avenue by which he may escape liability.

The verdict for the amount prayed was rightly directed, and judgment entered thereon.—Affirmed.