R. J. HOBBS, appellee, v. HOMES, INC., appellant; CHARLES E. YODER and VALLEY BUILDING CORPORATION, third party defendants-appellees.

No. 48729.

(Reported in 71 N.W.2d 592)

July 27, 1955.

J. C. Pryor and Pryor, Hale, Plock, Riley & Jones, all of Burlington, for appellant.

J. L. Thomas, of Burlington, for appellee.

Hirsch, Riepe & Wright, of Burlington, for third party defendants-appellees.

WENNERSTRUM, J.—The plaintiff, R. J. Hobbs, a plumbing contractor, brought an action against Homes, Inc., for damages by reason of the defendant's claimed breach of a written con-

tract entered into between them, including anticipated profits. The contract was executed by the president of the defendant corporation. In its answer the corporation denied the authority of the president, who also acted as general manager, to enter into and execute the contract and brought this individual, Charles E. Yoder, into the case as a third party defendant. This law action was tried to the court which filed its findings of fact and conclusions of law although they were not separately set out as such. By virtue of the holding of the trial court that the plaintiff was entitled to recover damages judgment was entered against the defendant corporation. The court dismissed the actions of the defendant Homes, Inc., and of the plaintiff, R. J. Hobbs, against the third party defendant Charles E. Yoder. Motions to set aside the judgment and for new trial were submitted and overruled. The defendant corporation has appealed.

It is disclosed by the record there was a prior corporation, called the Valley Building Corporation, which had been organized for the purpose of developing real estate in or near Burlington, Iowa, building homes thereon and selling them. Homes, Inc., was formed for the purpose of engaging in the same type of business, and it took over a part at least, if not in entirety, the building operations and the real-estate developments of the previously named corporation. Homes, Inc., was incorporated in April 1951 and had only five stockholders namely: Charles E. Yoder, who was named president and acted as general manager, Richard H. Plock and Elmer M. Jones, attorneys, located in Burlington, Iowa, John D. Brandli, of Short Hills, New Jersey, and Donald McMurray, of Des Moines. Jones was named as secretary and treasurer in the Articles of Incorporation and acted as such during the period involved in the present litigation. The five incorporators were later named as directors. In connection with the organization of the corporation it is shown Brandli, Jones and Plock held sixty per cent of the stock and Yoder and McMurray held forty per cent of it.

The suit brought by the plaintiff developed by reason of a contract entered into by the plaintiff with Homes, Inc. It was signed on behalf of the corporation by Charles E. Yoder, the president and claimed general manager.

There is substantial evidence to the effect there was a general shortage of plumbing material necessary for installation in the homes contemplated to be built by Homes, Inc. It is shown in the evidence the Valley Building Corporation had previously entered into an agreement and guaranty with R. J. Hobbs for the necessary plumbing material for inside installation in fifty dwelling units for the sum of $700 each or for a total amount of $35,000. It was therein provided the required plumbing material should be obtained as promptly as possible, that it was to be stored with a storage company in Burlington, that warehouse receipts should be obtained and upon presentation of all or any part of said receipts and an invoice for the necessary material Hobbs might borrow the cost of such material from the Burlington Bank & Trust Company. It was provided the warehouse receipts might be pledged as security. It was further therein provided the Valley Building Corporation guaranteed the indebtedness of Hobbs growing out of the extension of credit in connection with the advancing of funds on the warehouse receipts.

The contract between Hobbs and the Valley Building Corporation is referred to in the record as Exhibit B. It was dated February 16, 1951. Exhibit A, which is the contract involved in the present litigation, was executed by Hobbs and on behalf of the corporation by Charles E. Yoder on January 25, 1952. This contract was also dated February 16, 1951. The similarity of the dates is explained by the fact that Hobbs had a copy of the original contract which had been entered into with the Valley Building Corporation and in making the new contract in connection with the agreement claimed to have been entered into by Homes, Inc., the earlier agreement was very largely followed and the date in the new agreement was left the same as in the first one. However, there does not appear to be much question that this later contract as signed by Yoder and Hobbs was executed on January 25, 1952.

As indicative of the manner by which the plumbing material was handled in connection with the several homes it is shown by the record Homes, Inc. paid the charges occasioned by the storage of the plumbing material by R. J. Hobbs. Checks, eight

in number, in payment of the storage charges, with one exception, carried as joint signers either the signature of Jones or Plock. One check for $124.99 bore the signature of both Plock and Jones. The testimony of the manager of the storage company shows that the invoices for storage corresponded with the checks issued with one exception. There was no invoice shown for a check issued in the amount of $102. The earlier invoices for charges show they were made out to Charles E. Yoder. The last five were made out to Homes, Inc. There were two originally made out to Charles E. Yoder, but, as admitted in evidence, show a line drawn through the name and Homes, Inc. placed above in handwriting. The manager further testified: "The bills were sent to Mr. Yoder at Mr. Hobbs' direction. To start the account off we billed Charles Yoder. Payments were all made by Homes, Inc. We never had any dealings with Mr. Yoder personally."

It was originally planned Homes, Inc., should build 123 homes. At least there were some conversations relative to such a project. The plat discloses there were that many lots in one of the additions. However, Plock and Jones testified it was the policy expressed at least by these two men no speculative building should be done, that is, homes should be built first and then later sold. In connection with plaintiff's claim for damages it is shown plumbing materials for installation in fifty units were ordered and obtained by Hobbs, that only fourteen installations were made. Exhibit A, the agreement signed on behalf of the corporation by Yoder, is in part as follows:

"The parties hereby expressly contract for the inside installation of 123 complete plumbing units as described in the hereto attached exhibit for the sum of Six Hundred Fifty and 00/100 ($650.00) Dollars each or a total of Seventy-nine thousand, nine hundred fifty and 00/100 ($79,950.00) Dollars to cover fixtures, material and labor as described upon the attached exhibit. However, Party of the First Part shall pay the Second Party a sum equal to the increase in wages in addition to the Six Hundred Fifty and 00/100 ($650.00) Dollars if the wage schedule as fixed by the Burlington Building and Trade Council is increased above the present wage schedule.

"It is understood and agreed between the parties that the Second Party shall obtain the fixtures and the materials as quickly as possible and shall put the same in Atlas Warehouse No. 2 in the City of Burlington, Iowa, and shall obtain warehouse receipts therefor, and the Second Party may thereupon present the aforesaid warehouse receipts and his invoices showing the cost of said material and may borrow, from time to time, the cost of said material from Burlington Bank & Trust Company pledging as security therefor the aforesaid warehouse receipts. The interest payable to Burlington Bank & Trust Company on said advances shall be paid by the Second Party, but all warehouse expense of every kind shall be paid by the First Party."

It is for the anticipated profits which Hobbs would have received on the balance of the 123 units that the court entered judgment.

Despite the payment of the checks for the storage of the plumbing materials as previously set forth it is quite conclusively shown that Plock and Jones had no knowledge of the contract, Exhibit A, until August 7, 1952, when they first learned of it. Brandli, one of the directors, knew nothing of the agreement. Apparently McMurray, an inactive director, knew nothing about it. He did not testify as a witness. The question is consequently presented whether Yoder, by reason of the facts shown, had implied authority to enter into the contract with Hobbs on behalf of the corporation.

We deem it advisable to quote in part the testimony of the witnesses who testified relative to the duties of Yoder. Mr. Brandli testified: "We agreed that we would get into this building business with the idea that Yoder would handle the building and the financial, the legal end of it would be handled by Mr. Plock and Jones. * * * My understanding was that Mr. Yoder was to be in charge of the building and we were to have charge of the legal and financial end of it. The bookkeeping setup was under Mr. Jones' supervision generally."

Mr. Jones' testimony is in part as follows: "Q. During the course of business prior to August 17, 1952, had you obtained any information as to a contract—guaranty—on behalf of the Valley Building Corporation? A. Yes, it was shortly after the

change of our financial arrangements from the Burlington Bank and Trust Company to the National Bank of Burlington in the middle of July 1951. Mr. Yoder came to my office one day and said that Valley Building Corporation had some kind of a guaranty agreement with the Burlington Bank and Trust Company which they were guaranteeing some loans of Mr. Hobbs. He asked me at that time what I thought about taking that matter over. Before answering Mr. Yoder I called to Mr. Plock, whose office is right next to mine, and the door between us was open, and he came into my office. We related the same information to Mr. Plock, and I told Mr. Yoder that we should not take over the obligation that Valley Building had with Mr. Hobbs and that we were not going to guarantee Mr. Hobbs' loans or enter into contract with Mr. Hobbs other than that Mr. Hobbs could do our plumbing when Mr. Yoder decided that he was the man to do it, on a house to house basis. Q. What do you mean by 'house to house' basis? A. Well, in conformance to our plans, we weren't to build any houses until they were sold, and, therefore, we were not making any arrangements until after a house was sold—what I mean—as the plumbing would be ordered—as each house was sold—and Mr. Hobbs could be paid after he had finished his work. * * * I was Secretary-treasurer of Homes, Inc., and a member of the Board of Directors. Mr. Yoder was President and General Manager. He was in charge of the building operations. I was technically in charge of the books; that is, I was to exercise some supervision over the bookkeeping * * *. At the time of the formation of Homes, Inc., Mr. Plock was generally to look after the financing. The building itself was Mr. Yoder's problem. Mr. Plock and I did not exercise any control as to the actual mechanics of the building, but we certainly exercised control over where to build and what to build. We did not take action on each house after the general plan had been established. The general plan was that, first of all, no houses would be built until they were sold. * * * There was no action of the Board of Directors or Stockholders on any contract other than the purchase and sale of land. As to the availability of plumbing fixtures and equipment in 1951 and 1952 I know only what Mr. Yoder told me. There was no action in the minutes of the discussion of the assumption by Homes, Inc., of the Valley Building contract. We

quite often questioned things that Mr. Yoder did during the last month or two he was general manager. There were some financial arrangements shortly after the organization of the company that were objected to by Mr. Plock and myself. There were some objections to some of the arrangements that were made with carpenters. There was some discussion and some objection to some pricing of houses at one time. The Burlington Bank and Trust Company has never called on Homes, Inc., to fulfill any guaranty they might have made under Exhibit A. The policy of not doing any speculative building has not continued to date. There were several houses built in advance in 1952 and some in 1953. By being built in advance I mean being built in advance of being sold. * * * We paid storage on some plumbing from the date of incorporation, 1951, through February 1953. After the contract, Exhibit A, was disclosed to me, Mr. Plock and I discussed it, and the next day we notified Mr. Yoder and Mr. Hobbs and the Burlington Bank and Trust Company and disavowed the contract; that Homes, Inc., disavowed the contract, the alleged contract; that the contract [Yoder] was never authorized to sign any such contract. On August 9th or 10th, I don't recall which, I went to Mr. Yoder's office on the fifth floor of the Tama Building, and Mr. Hobbs was there. They evidently had been discussing this alleged contract, and it was mentioned to me. I again disavowed the contract to Mr. Hobbs but did say that if Mr. Yoder wanted him to go ahead on a house to house basis, it would be all right with me. He had formally [formerly] done that. * * * Q. Was there any meeting—is there anything in the minutes of the meetings of the Board of Directors in connection with disavowing the contract? A. No, there is not."

Mr. Plock testified in part as follows: "Mr. Yoder was in general charge of the building. His job was to get the material and make arrangements for the labor. It was his responsibility to get the job done, to see that the houses were built. I don't know whether or not there was any written agreement with Mr. Brandli, but it was very definitely understood by all parties that there was to be no speculative building. That was from the time that the corporation was organized to August 1952. Since then to some extent we found it necessary to take certain calculated

risks. I was not familiar myself with the supply situation so far as plumbing, electrical equipment, was concerned in 1952. At the time Homes, Inc. took over, it did not succeed to the operation of Valley Building. It was entirely a different corporation, different parties. Homes, Inc. took over from Valley Building the acreage that became known as Windsor Circle, but Valley Building did not own it. They just had an option. They did take over the West Air property and the equipment Valley Building had. I assume that most of the staff workers hired had been with Valley Building. The contract for the one house in Windsor Circle was signed, as I recall, 'Homes, Inc.' But the work was started by Valley Building. It seems to me there were four houses that had been started or were completed that were taken over by Homes, Inc., for Valley Building. They were all sold too cheaply, and the prices had been raised thereafter. So what Homes, Inc. did was to relieve them of the contracts because they couldn't go ahead with the planning and carrying out the building program."

Mr. Yoder's testimony is in part as follows: "It was part of my duties to see that the materials and labor for the various construction jobs of Homes, Inc., was furnished and hired. That was true throughout the entire period of time in which I was president of Homes, Inc. * * * During the period I was president and manager of Homes, Inc., either I directly or indirectly through Thelman and Nelson ordered all of the materials that went into all of the construction work. The same was true of labor. * * * The matter of Hobbs furnishing the material and doing the plumbing work for the West Air properties was discussed with Mr. Jones, Mr. Hobbs and myself. Q. And at that time was Exhibit F [plat of first addition to West Air] before the three of you? A. Well, I don't know that exhibit was there or not. We discussed the layout. Q. Yes. Did you discuss the proposed layout as is shown on Exhibit F? A. No, not at that time. We knew what we were going to do, and we discussed putting in the plumbing in these 123 houses. Q. Yes, and I'll ask you whether or not the provisions which were ultimately reduced to writing, as shown on Exhibit A, were discussed at that time? A. No. It was just a continuation of the way we had been doing business. * * * It was definitely understood by me that I would be charged with the entire responsibility of taking whatever steps

were necessary to get the buildings completed. That's all I wanted to do. Jones, who had had accounting at Iowa University, was going to take over the accounting, and Plock was to raise the money and take care of the finances, and so forth. * * * The furnishing of material and labor was my responsibility and there was no limit put on. * * * In 1951 plumbing was one of the critical materials. It was practically impossible to get, and before we started into the Windsor Circle the first thing I did was to take steps to protect ourselves against the shortage of plumbing and electric because that would have broke us, to build houses and not be able to get the plumbing and the electric. That was the first thing I did before the ground was platted, was to make sure we had the critical materials on hand to complete the job. Otherwise it would have been impossible. We couldn't get plumbing hardly anywhere. You couldn't get it here in Burlington. It has eased off somewhat now. In February 1951 I made a contract with Mr. Hobbs concerning plumbing. Exhibit B is that contract. * * * That was the contract I made with Hobbs in order that we would have plumbing supplies to complete Windsor Circle before we discontinued business. Those units referred to in Exhibit B were subsequently used by Homes, Inc., in Windsor Circle, and we might have used a few of them in other operations. I am not sure where it all went. Q. But the plumbing supplied by that contract went into the houses built by Homes, Inc.? A. That's right. Homes, Inc. was informed of my having these materials ready—otherwise there would have been no Homes, Inc. The same way with the electric contract—without it we couldn't have built homes. We couldn't have operated on—couldn't have completed any."

 I. It is the contention of the defendant corporation, Yoder as president had no authority under the Articles of Incorporation or by virtue of any action of the Board of Directors, as shown by its minutes, to enter into a contract with Hobbs and thereby bind the corporation. It is our conclusion the authority of Yoder to enter into the contract in question on behalf of the corporation should not be limited in the manner as claimed by it. Yoder was more than president. He was general manager in charge of construction. As heretofore shown by the testimony

of the complaining directors it was the responsibility of Yoder to have the houses constructed. It was incumbent on him to see that the necessary materials were obtained to construct and complete the houses. It must be apparent that there would have to be a supply of plumbing equipment on hand for necessary installation as required. Although we have not set out the testimony of Hobbs, he testified that on or about January 25, 1952, he was in the office of Jones along with Yoder and there was a discussion relative to the cost of the installation of inside plumbing, that Jones endeavored to get him to make a price of $600 per unit installation and it was finally agreed the price should be $650. This testimony was not contradicted by Jones.

There is a plat in evidence which shows the corporation had laid out approximately 123 lots. It is quite definitely shown there was a housing shortage in or about Burlington at the time of the incorporation of Homes, Inc. Despite the testimony of Jones and Plock that the building of homes should be on a "house to house" basis yet there is no denial of the fact there was a preliminary conference relative to the price of plumbing installation in which Jones participated. At that time Hobbs agreed to lower the price of inside plumbing installation from $700 to $650. This is the price incorporated into the agreement between Hobbs and Homes, Inc.

There are other facts which should be kept in mind in connection with the question of the implied authority of Yoder to enter into the contract with Hobbs on behalf of the corporation. Then, too, it is shown the offices of Homes, Inc., were in the same building as the offices of Jones and Plock, and there were frequent conferences between these two individuals and Yoder in connection with the building of the homes. The further fact the invoices for storage of the plumbing materials were paid by checks, with one exception, signed by either Jones or Plock indicated either knowledge of the nature of the arrangement or that the complaining directors were turning over all details in the matter of getting the houses constructed to Yoder. It is all indicative of his implied authority.

We are convinced the plaintiff has met the burden of proof required of him to show Yoder's implied authority. At least, we

are satisfied he has presented sufficient evidence to generate a fact question concerning his authority. If the case had been tried to a jury, the plaintiff, with the same evidence as disclosed by the record, would have met the burden placed on him sufficiently to justify the submission to the jury of the fact question of Yoder's implied authority. Webster County Buick Co. v. Nebraska Buick Auto. Co., 216 Iowa 485, 488, 249 N.W. 203, 205.

Concerning a situation somewhat similar to the instant case we said in Citizens Bank v. Public Drug Co., 190 Iowa 983, 986, 181 N.W. 274, 276: "To the proof of the fact that he was president, or chief executive officer of the company, is added other evidence that he was also one of its three directors and the manager of its business, which, as we gather from the record, was the carrying on of a retail trade in drugs. The entire company was made up of Bronson and his wife and one O'Keefe, who is not shown to have any active hand in the business. Under such circumstances, we think it was a fair question for the jury whether contracts made in the company's name by its president and manager, within the scope of the business it was organized to carry on, were made with the implied authority of the corporation; and if so, and the note in suit be found to have been a contract of that character, and no other defense be established, then plaintiff would be entitled to recover. That authority of the president or of the manager of its business to bind a corporation by contracts made in its name or behalf need not be shown by formal vote or order of its board of directors, or by formal record, is well established."

Numerous authorities are set forth in the above cited case in support of the holding quoted, including: White v. Elgin Creamery Co., 108 Iowa 522, 526, 79 N.W. 283; Ney v. Eastern Iowa Tel. Co., 162 Iowa 525, 542, 144 N.W. 383.

In 19 C. J. S., Corporations, section 1043(f), pages 544, 545, it is stated unless the authority of a general or managing agent is specially restricted such general or managing officer may enter into any contract which is usual, proper or necessary to be made in the ordinary transaction of the company's business. And it is also there held a general or managing officer will be presumed, in absence of proof to the contrary, to have authority to

enter into contracts relative to matters arising in the usual or general course of the corporate business.

We cannot hold the trial court should have directed a verdict because of a lack of evidence to show implied authority on the part of Yoder to bind the corporation.

■ II. Inasmuch as the case, a law action, was tried to the court its findings that Yoder, as president and general manager, had implied authority to bind the corporation were equivalent to and had the same force and effect as a jury verdict. Weber v. Hansen, 241 Iowa 904, 909, 43 N.W.2d 766; Coble v. McChane, 233 Iowa 54, 55, 8 N.W.2d 755; Brown v. Compton & Roush, Inc., 243 Iowa 665, 671, 53 N.W.2d 164; Ruble v. Carr, 244 Iowa 990, 993, 59 N.W.2d 228.

Where a law action is tried to court its findings will not be disturbed on appeal if supported by substantial evidence. Hockert v. New York Life Ins. Co., 224 Iowa 789, 794, 276 N.W. 422; Crouse v. Cadwell Transfer & Storage Co., 226 Iowa 1083, 1086, 285 N.W. 623.

■ III. Homes, Inc. contends the Agreement and Guaranty, Exhibit A, was an indivisible contract. It is maintained that the portion of the agreement relative to the guaranty to the bank for the subsequent indebtedness of Hobbs was beyond the authority of Yoder, as president and general manager, and, as claimed concerning the contract generally, was illegal and beyond his authority. It is our conclusion this phase of the case is really not before us for consideration. The bank was in no way a party to the litigation. It has made no claim against Homes, Inc. No loss has resulted to the corporation by reason of this part of the contract.

We do not deem it necessary to determine whether the guaranty part of the contract was legal. It is sufficient for us to hold, as we have, that the question of the implied authority of Yoder relative to the ordering of the materials was a fact question for determination by the trial court, acting as a trier of the facts.

Even if it be conceded, which we do not, that the guaranty portion of the contract was beyond the authority of Yoder to enter into and was illegal, yet we hold where a portion of the agreement was legal, or could be so determined by the trier of the

facts, then recovery could be had on the legal portion thereof.

It was so held in Fryer v. Harker, 142 Iowa 708, 713, 121 N.W. 526, 528, 23 L. R. A., N. S., 477, where in an equity action we stated: "It is a fundamental rule of law that if there be a contract legal in part and illegal in part, and the legal can be settled without reference to the illegal, recovery may be had on the legal part thereof." See also Osgood v. Bauder & Co., 75 Iowa 550, 555, 39 N.W. 887, 1 L. R. A. 655.

 We do not find in the contract under consideration such an indivisibility which would prevent recovery on the part of Hobbs alone for the failure of Homes, Inc. to build the remainder of the 123 homes. It is stated in 12 Am. Jur., Contracts, section 318, page 874, the entirety of a contract depends upon the intention of the parties and not upon the divisibility of the subject. When the court found Yoder had implied authority to make the contract it could also hold it was the intent of the parties to do only that which was necessary. The bank has never called on Homes, Inc., to carry out the provision relative to the guaranty.

 IV. It is claimed on the part of Homes, Inc. error was committed by the trial court in that it failed to make separate findings of facts and conclusions of law as required by rule 179, R. C. P.

In the present case the court made a fairly extensive review of the evidence in what it terms its Findings of Fact and Conclusions of Law. It is also therein stated: "It is my conclusion that CHARLES E. YODER, as President and General Manager, and the person who was in charge of the building operations and of the procuring of the materials, the contractors and the labor to carry on such operation, did have implied authority to execute this contract, Plaintiff's Exhibit A, on behalf of HOMES, INC."

 Homes, Inc., through its counsel, asked for more definite findings of fact and conclusions of law. This request was denied. We hold the statements made were sufficient in nature. The findings of a trial court should be broadly and liberally construed rather than from a narrow or technical standpoint. And it has been held the intent of the court must be determined from all parts of the instrument. Rank v. Kuhn, 236 Iowa 854, 856, 20 N.W.2d 72, and authorities cited. We find no error as claimed by

Homes, Inc. in respect to the trial court's findings of fact and conclusions of law.

Upon a review of the evidence and the applicable law we hold: Exhibit A was properly admitted in evidence, plaintiff had sustained his burden of showing Yoder's implied authority to execute the contract on behalf of Homes, Inc., the trial court properly overruled the motion of Homes, Inc. for a directed verdict, there was no error in the court's refusal to enlarge on its findings of fact and conclusions of law, the trial court properly overruled the motion of Homes, Inc. to set aside the judgment and grant a new trial, and in dismissing its action against Yoder, the third party defendant. We have not commented upon the various detailed brief points of Homes, Inc. Our previous statements and holdings are determinative of the case and of the issues presented by Homes, Inc.

We therefore affirm the trial court.—Affirmed.

All JUSTICES concur.