CLIFFORD LUNGREN, appellee, v. LAMONI PROVISION COMPANY, INC., a corporation, et al., appellants.

No. 49007.

(Reported in 82 N.W.2d 749)

MAY 7, 1957.

Lundy, Butler & Lundy and Donald C. Wilson, all of Eldora, for appellants.

R. B. Hawkins, of Leon, and Killmar & Reynoldson, of Osceola, for appellee.

WENNERSTRUM, J.—Plaintiff's action was one at law wherein he sought to recover claimed damages in the amount of $20,000 by reason of the purchase of forty shares of common stock of the Lamoni Provision Company, Inc. In his petition plaintiff pleaded the stock transaction was entered into by reason of fraud which induced and brought about the purchase made. Later the plaintiff rescinded the contract, tendered back the stock and sued at law to recover the claimed damages. The case was tried to the court. It is maintained in this court that after the submission of the action in the trial court the nature of the proceedings was changed by a subsequent pleading filed by the plaintiff to a claim for restitution based on rescission. The defendants, in connection with their defense, counterclaimed for an alleged balance due on the purchase price of a claimed one-fourth

interest in the company. The trial court found for the plaintiff and entered judgment against the defendants for $15,000, with interest. They have appealed.

The facts which are the basis of plaintiff's action involve the claimed organization and promotion of a frozen foods business which was contemplated to be developed in and about Des Moines and later throughout the State of Iowa. During the years 1949 and 1950 the plaintiff had an interest in a sales barn at Mount Ayr, Iowa, where he became acquainted with David O. Thompson and James K. Smith. These two men were then engaged in the operation of a meat-packing plant at Lamoni, Iowa. They were extensive purchasers at plaintiff's sales barn. In 1950 Clifford Lungren, the plaintiff, disposed of his interest in the sales barn and in January 1953 was operating his farm in Ringgold County, Iowa. He had attended a country school through the eighth grade but had never attended high school.

The Lamoni Provision Company, one of the defendants of this action, is a claimed corporation with its principal place of business in Lamoni, Iowa. The object of this corporation was to supply the public with food-freezing equipment and a line of frozen food products, all of which were to be sold on a partial-payment plan. Thompson and Smith became interested in the development of the Lamoni Provision Company in February of 1952 through one E. L. Anderson, who was then engaged as a butcher and meat dealer in Des Moines. Both Smith and Thompson gave considerable time to making arrangements for dealerships of freezers and for the buying of frozen fruits and vegetables. The contemplated plan of operation was to sell a freezer at retail and to also sell four to six months supply of food to be kept in it. It was contemplated these proposed sales would be financed for a period of from 18 to 24 months for the equipment and from four to six months for the food. A down payment of ten per cent was required from each purchaser and the balance was to be financed through a bank by the sale or discounting of the conditional sales contract entered into by the purchaser of a freezer and the supply of frozen foods.

An apparent partnership was originally effected by Thompson, Smith and Anderson and arrangements were made by them

with the Bankers Trust Company of Des Moines for the discounting and sale of the conditional sales contracts. When Anderson, Thompson and Smith commenced the operation of the freezer and frozen foods business it was carried on under the name of the Dollar Harvest Provision Company. It began business in February or March of 1952 as a partnership with each of the men investing $1000. The first bank deposit of the company was on March 21, 1952, and was in the amount of $3000. On March 26, 1952, E. L. Anderson filed two verified statements of trade names in which he listed the owners of the partnership as E. L. Anderson, Dave Thompson and James K. Smith. Later Articles of Incorporation of the Lamoni Provision Company, Inc. were received in the office of the Secretary of State on April 2, 1952, in which Articles it was set forth the corporation was authorized to commence business when $18,000 in stock had been issued. The authorized capital stock was $25,000. It was also therein provided no stock was to be issued until cash had been paid for it or for property, after approval of it, by the Executive Council of this State, and as provided in section 492.6 of the Code. It is shown by the record no stock was issued under this authorization and the articles were returned to the office of the Secretary of State along with an affidavit stating no business had been transacted by the corporation. Substituted and Amended Articles of Incorporation of the Lamoni Provision Company, Inc. were filed and recorded in Decatur County on May 21, 1952. In these amended articles it was provided the capital stock was to consist of $25,000 in common stock and preferred stock in the amount of $25,000. It was also provided the corporation could commence business when common stock in the value of $3000 had been issued. It appears that stock was issued to Anderson, Thompson and Smith although there was no money paid into the corporation and there were no assets turned to the corporation and stock issued in lieu of cash as provided by statute. This stock was issued on June 26, 1952. Ten shares were issued to each of the last named persons. In other words there was no appraisement of any property received or to be received by the corporation after appraisement and authorization by the Executive Council of the State of Iowa. Section 492.6, 1950 Code.

It should be kept in mind the only evidence of any cash payments is that of $1000 paid by each, Thompson, Smith and Anderson to the Dollar Harvest Provision Company, the partnership. There is no evidence of any transfer of any property or assets from the partnership to the claimed corporation. Despite this situation it is shown Thompson, on June 26, 1952, swore to a "Certificate as to Issue of Capital Stock" that the corporation had received $3000 in cash for the issuance of the stock.

The Dollar Harvest Provision Company had two places of business in Des Moines and one in Cedar Rapids. On or about January 8, 1953, Thompson visited with the plaintiff, Clifford Lungren, while at a sales barn at Grant City, Missouri. Thompson told the plaintiff he and his associates were looking for a partner who might wish to invest money in the food freezer business.

On January 13 or 14, 1953, both Thompson and Smith talked to Lungren about the possibilities of the suggested business venture. This was at Lamoni. On January 15, 1953, plaintiff and his wife, accompanied by Thompson and his wife, went to Des Moines for the purpose of inspecting the business operations of Thompson, Smith and Anderson. They stayed all night in Des Moines and on the next day Mrs. Thompson and Mrs. Lungren returned to Lamoni in the Lungren car and Thompson and the plaintiff went to Cedar Rapids to inspect the business operations there. The two men returned to Lamoni early in the morning of January 17.

During the conversations between Thompson, Smith and Lungren the plaintiff was referred to Steven V. Carter, an attorney in Leon, Iowa. He was the attorney for Thompson and Smith. On the evening of January 18, 1953—a Sunday—a conference was held at the office of Mr. Carter at which time there were present Lungren, his wife, and Carolyn Lungren, a daughter, and Carter. There appears to be some dispute in the evidence whether this date was January 11 or January 18, 1953. It is contended by Carter this first meeting was on January 11. There is unquestionable evidence the Lungren family was at another place on the date in question. However, on the evening

of January 19, 1953, a contract of purchase was entered into between Thompson, Smith and Lungren. This contract provided that Thompson and Smith would secure for Lungren a one-fourth interest in the Lamoni Provision Company, Inc. It was also therein provided that Lungren would pay $10,000 for this interest and sufficient stock would be issued by the Lamoni Provision Company to the three parties so that each would have an equal share with the other. Lungren was to pay $6000 in cash, and notes for $2000 each were to be given to Thompson and Smith.

It appears that later in the evening of January 19, 1953, Smith, Thompson and Lungren rode back to Lamoni from Carter's office in Leon and while in this latter city and despite the terms of the contract Lungren gave a check for $5000 to Thompson and a similar check to Smith. These checks were never presented or cashed. On January 21, 1953, Thompson arranged with Lungren to make a trip to Chicago with him by automobile. On the way to Des Moines on January 22 Thompson sought to have Lungren pay him $10,000 more on the purchase price. The plaintiff informed Thompson he did not have that much money in the bank but said he would give him a check for $6000. When the parties reached Des Moines the plaintiff gave a check for $6000. This check dated January 22, 1953, was made payable to the order of the Lamoni Provision Company and bears the endorsement of the company.

Later negotiations and conversations indicate representation was made to Lungren to the effect the interest he was to receive was worth $20,000 and settlement was to be made on that basis. It should be stated Smith denied he ever made representation the stock to be sold Lungren was worth $20,000 or that his share was worth $50,000. However, it would appear later negotiations and settlements were on the basis of $20,000. In this connection Steven V. Carter, the attorney, testified:

"As I recall, when this contract was prepared, they told me the agreement was that Lungren was to pay $6000 to the Lamoni Provision Company, Inc., and $7000 to David O. Thompson and $7,000 to James K. Smith, and that he was to receive for that a one-fourth interest in the Lamoni Provision Company, Inc.,

in the business." During his examination the following record was made: "Q. Is it your claim if Lungren paid $6000 to Lamoni Provision Company and paid $14,000 to David Thompson and Jim Smith, that that would be payment in compliance with the terms of the contract? A. That is right."

Thompson testified concerning this transaction as follows:

"On January 22, 1953, Lungren gave a check there to the Lamoni Provision Company for $6000 in cash and on February 18, 1953, he endorsed over a sight draft to me for $7000 and a sight draft to James K. Smith for $7000. For that money he got a one-fourth interest in the Lamoni Provision Company and he was—for the $14,000 he was—We were having a partnership on the cattle and the pasture and stuff, but that wasn't a fixed payment. He had all the cattle before I gave him those sight drafts and he turned them back to me. I would say that the way the $14,000 he was to pay us was set out in the contract, and then the way it was paid, this would have supplemented the contract."

The original contract which was entered into on January 19, 1953, had no provisions similar to the final transaction.

In connection with the negotiations carried on by the parties it was arranged that the plaintiff should move to Des Moines to take over the management of the properties there. By reason of these arrangements the plaintiff had a farm sale and disposed of most, if not all, of his farm property including a considerable amount of livestock. On Sunday, February 15, which was the day prior to the farm sale, Thompson visited with the plaintiff at the latter's home and made inquiry if plaintiff was going to put all of his cattle in the sale so he could pay "them off in full." This latter statement is apparently a reference to Lungren's claimed obligation to Smith and Thompson. Thompson advised the plaintiff that he and Smith would take the cattle over that Lungren did not want to sell and they would borrow the money on the cattle if plaintiff would release this property to them. Plaintiff agreed to do this. Through negotiations with the Creston Production Credit Association, to whom the plaintiff was apparently indebted, arrangements were

made for this transaction. On February 18, 1953, Smith bought 50 steers from Clifford Lungren for $7000 and paid for them by a sight draft, drawn on the Creston Production Credit Association. Thompson also bought 50 head of steers from the plaintiff for $7000 and payment was made in the same manner as Smith. Plaintiff then endorsed one draft to Thompson and the other to Smith. On February 21, 1953, the plaintiff paid the Creston Production Credit Association $14,000 by check on his account in the Citizens Bank of Grant City, Missouri. This payment was made for the purpose of paying off a chattel mortgage on the steers sold to Thompson and Smith. With the prior payment of $6000 given to the Lamoni Provision Company and the two sight drafts of $7000 each there was a total of $20,000 that had been obtained from the plaintiff.

Although it is necessary to omit many of the details of the evidence it is of interest to know that on or about the time of the negotiations with Lungren, Thompson and Smith were dealing with E. L. Anderson in an effort to purchase his interest in the business. This was consummated by a sale by him to an outside party for his one-third interest for $1000. As of March 1, 1953, there were issued to Clifford Lungren forty shares of stock of the Lamoni Provision Company, Inc.

In connection with the negotiations between Thompson, Smith and Lungren there was shown him a balance sheet statement as of December 31, 1952, in which, as part of the assets, was an item of $19,991.14 listed as "reserve held by banks as collateral on notes discounted." This amount was apparently the reserve held by the Bankers Trust Company Bank to protect them on defaulted contracts. It should be noted the bank made no purchases of new contracts after January 20, 1953. It is the claim of the plaintiff Smith and Thompson told him there was a $19,000 profit in the business and if he would invest $20,000 there would be a division of the $19,000 profit about May 1, 1953. There is evidence given by the plaintiff to the effect both Thompson and Smith told him of their claimed value of the property and they would not take $50,000 for their individual interest. There is further testimony that in connection with the conference with Steven V. Carter it is claimed he stated there were great possibilities in the business. It is claimed on behalf

of the plaintiff Carter stated he had offered the defendants $18,000 for the same interest plaintiff was getting and that he, the plaintiff, would be lucky to get it for $20,000. The necessity of limiting the length of this opinion requires the omission of a great deal of the evidence from the statement of facts. It perhaps should be stated that after a period of time in Des Moines the plaintiff concluded the business was not a profitable one. He had learned the claimed freezers, which he had understood were the property of the corporation, were merely held on a conditional basis. He severed connections wth the business on April 3, 1953. The plaintiff later returned his stock to the parties and asked for the return of the money he had invested. This was not forthcoming and the plaintiff's action against the defendants resulted.

The trial court held the value of the cattle was only $9000 instead of $14,000 and on that basis entered judgment against the defendants for $15,000. The plaintiff had sought recovery of $20,000.

I. This cause was tried to the court and its findings of fact cannot be disturbed on appeal unless there is a lack of evidence to support them. Brown v. Compton & Roush, Inc., 243 Iowa 665, 671, 53 N.W.2d 164; Weber v. Hansen, 241 Iowa 904, 909, 43 N.W.2d 766. If this case had been tried to a jury and a motion for a directed verdict had been made at the close of the plaintiff's case or at the close of all the evidence it is our conclusion the record would have been sufficient to warrant the submission of the fact questions to a jury. Coble v. McChane, 233 Iowa 54, 55, 8 N.W.2d 755. See also Hobbs v. Homes, Inc., 246 Iowa 1195, 1207, 71 N.W.2d 592; Staley v. Fazel Bros. Co., 247 Iowa 644, 648, 649, 75 N.W.2d 253, 255, 256; Swift v. Petersen, 240 Iowa 715, 721, 37 N.W.2d 258.

II. It is the claim of the defendants, as one of the grounds for reversal, the trial court erred in finding there had been representations "the corporation was fully organized when, in fact, there had been no compliance with * * * the Code, constituted a false representation, concededly made." The question thus arises whether at the time of the dealings between the plaintiff and Thompson and Smith the Lamoni Provision Company, Inc. had been properly and fully incorporated.

When the statutory requirements have been complied with a corporation is incorporated. In the instant case it is quite apparent the money put into the original partnership was $1000 each by Thompson, Smith and Anderson. We find no evidence of any other cash or property contribution by the claimed incorporators. Under sections 492.6 and 492.7, 1950 Code, the statutory provisions for the issuance of stock for property are set forth. We do not find where any effort was made to comply with these statutes. Nor has our attention been called to any property claimed to have been held by the original partners, which was transferred to the claimed corporation, and for which stock could have been issued if the statute had been followed.

In the case of Fish v. White, 180 Iowa 1176, 1180, 1181, 162 N.W. 753, 754, we find a situation somewhat similar to the present one. It is therein stated: "It appears without dispute that the shares of stock were issued without authority. The offer of such stock for sale was in itself a false representation that the shares had been issued in accordance with law and that the amount thereof had been, in good faith, paid into the company's treasury. Sykes v. Pure Food Cider Co., 157 Iowa 601. That such representation was untrue is not denied. The fact, if it be a fact, that the defendants put an amount of money equal to the par value of the stock into the original partnership or partnership business is no answer to the proposition that the stock was issued without authority. What the partnership turned over to the corporation was not the money which the partners had invested, but the property for which that money or a part thereof had been expended."

And in Stern v. National City Co., 25 F. Supp. 948, 957, it is stated: "It would seem to follow axiomatically that refusal to comply with the law designed to prevent fraud is of a species of fraud. See also Fish v. White, 180 Iowa 1176, 162 N.W. 753; Rhines v. Skinner Packing Co., 108 Neb. 105, 187 N.W. 874; Walker v. Harbor Realty Co., 214 Cal. 46, 3 P.2d 557."

And in Fish v. White, 188 Iowa 57, 58, 59, 175 N.W. 748, 749, an appeal in the retrial of the prior referred to Fish v. White case, it is stated: "That the officers of a corporation are personally liable for a fraudulent issue of stock, or stock issued in violation of law, has been settled by this court. Sykes v. Pure

Food Cider Co., 157 Iowa 601. When the defendants incorporated and took over the personal property belonging to the partnership, and issued stock, without having the property appraised by the executive council, the stock issued was issued in violation of the statute hereinbefore set out. In issuing the stock, there was an implied representation that the statute had been complied with. The implied representation was that the stock had been fully paid for in cash. In the Sykes case, supra, it was held that the issuance of certificates of stock was a representation that the corporation had received par value therefor, as exacted by the statute, and the officers issuing the stock are responsible to the persons dealing directly with it, and to all who deal with the stock in reliance upon the representations so made."

III. The plaintiff pleaded fraud and misrepresentation as a basis for his action. Prior to bringing his action he tendered back the stock issued to him and asked that the money paid by him be returned. The defendants refused the plaintiff's demands and returned the stock to him. The procedure followed by the plaintiff was similar to that followed in the law action commented on in Lambertson v. National Investment & Finance Co., 200 Iowa 527, 531, 202 N.W. 119, and cases cited.

A party who has entered into a contract which it is claimed was fraudulent may institute an action at law to recover the consideration paid by giving notice of his decision to rescind the contract and restore the claimed offending party to his or its original position. Such a plan of action is approved in Kuehl v. Parmenter, 195 Iowa 497, 501, 192 N.W. 429; Rose v. Eggers, 148 Iowa 306, 311, 127 N.W. 196; Cox v. Cline, 139 Iowa 128, 132, 133, 117 N.W. 48; Olson v. Brison, 129 Iowa 604, 605, 606, 106 N.W. 14.

IV. It is the defendants' contention the plaintiff failed to prove the essential elements of fraud by the degree of proof required. It is maintained the thirty shares of stock issued to Thompson, Smith and Anderson were not offered to plaintiff for sale and were not sold to him. It is further contended the forty shares of stock issued to Lungren were for additional shares of stock and were issued for cash and consequently no misrepresentation resulted.

Despite the fact the plaintiff may have paid cash for the stock issued to him there yet remains the question whether the corporation was properly organized. If there had been a failure to properly effect the corporate organization it would appear this and other facts pertaining to this situation would have a bearing on the claimed fraudulent misrepresentation.

■■ It is claimed that the proof presented by the plaintiff failed to prove fraud by clear, satisfactory and convincing evidence. This was the holding in Cataldo v. Compiano, 247 Iowa 999, 1016, 76 N.W.2d 214, 223, an equity action where it was sought to reform an offer to buy. However, the instant case is one at law for the recovery of damages. A question of fact in a law action submitted to a jury, or as in the present case to a court, is to be determined by a preponderance of the evidence. Crandall v. Bankers Life Co., 245 Iowa 540, 549, 550, 62 N.W.2d 169, and cases cited. Regardless of the degree of proof required we are convinced there was ample evidence to justify the submission of the case to a jury, if the case had been tried to a jury, and to the court in this case for the determination of the fact questions. As previously stated the evidence submitted was of a sufficient character to justify a holding a directed verdict should not have been entered, if such a motion had been made.

■ V. Under the record as presented we are convinced the trial court was correct in its holding there was ample evidence of fraudulent misrepresentation. We are also satisfied there was no change in the nature of the action by a pleading filed after the action had been submitted to the trial court. To reverse this case upon technical grounds, which to us do not appear meritorious or prejudicial would, we believe, constitute a miscarriage of justice. We therefore affirm.—Affirmed.

All JUSTICES concur.