# IN THE SUPREME COURT OF IOWA

No. 07–0744
08–1590
08–1778

Filed May 6, 2011

**SOULTS FARMS, INC.,**

Appellant,

vs.

**CHARLES J. SCHAFER,**

Appellee.

------------------------------------------------

**CHARLES J. SCHAFER,**

Appellee,

vs.

**SOULTS FARMS, INC.,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Guthrie County, Gary G. Kimes, Judge.

A farming corporation appeals an adverse verdict affecting its real property. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED, AND CASE REMANDED.**

Wade R. Hauser III and Amanda G. Wachuta of Ahlers & Cooney, P.C., Des Moines, for appellant.

Randy V. Hefner (until withdrawal) and Matthew J. Hemphill of Hefner & Bergkamp, P.C., Adel, for appellee.

**WIGGINS, Justice.**

This is a consolidated appeal brought by Plaintiff-Appellant, Soults Farms, Inc. (SFI), against Defendant-Appellee, Charles J. Schafer (Schafer), arising from SFI's quiet title action seeking to remove Schafer's purportedly spurious mortgage from SFI farmland. Schafer filed a counterclaim asking for judgment on the notes he had with SFI. In the counterclaim, he also sought to foreclose on his mortgage. The district court entered judgment in favor of Schafer. SFI seeks to reverse the district court's ruling granting summary judgment against SFI and denying its quiet title action. SFI also seeks to reverse the district court's ruling denying its petition to correct, vacate, or modify judgment or grant a new trial, and the district court's decision to award attorney fees to Schafer.

The court of appeals affirmed the district court's denial of SFI's petition to correct, vacate, or modify judgment or grant a new trial, and its decision to award attorney fees. In its decision, the court of appeals, however, did not consider the merits of SFI's quiet title action and Schafer's counterclaims. Accordingly, on further review, we affirm the decision of the court of appeals. We affirm the district court's rulings, and we remand the case to the district court to determine reasonable attorney fees and expenses incurred by Schafer on appeal.

## I. Issues.

This appeal presents with multiple issues. First, we must decide the extent to which SFI is liable for the notes executed by Marion R. Soults (Bud). Second, we must determine whether Bud had authority to bind SFI to the mortgage agreement. Third, we must decide whether valid consideration supported the mortgage. Fourth, we must evaluate issues concerning the interpretation of the mortgage. Fifth, we must

consider SFI's petition to vacate judgment or grant a new trial in light of Bud's testimony taken after trial. Finally, we must determine the issue of attorney fees.

**II. Loan and Mortgage Issues.**

**A. Scope of Review.** The quiet title and mortgage foreclosure proceedings were tried to the bench in equity. We review equitable proceedings de novo. *Green v. Wilderness Ridge, L.L.C.*, 777 N.W.2d 699, 702 (Iowa 2010) (citing Iowa R. App. P. 6.907). In equity cases, we are not bound by the district court's factual findings; however, we generally give them weight, especially with regard to the credibility of witnesses. *Simpson v. Kollasch*, 749 N.W.2d 671, 673 (Iowa 2008).

We also feel it is necessary to note that the district court's initial ruling, particularly its conclusions of law, is practically a copy of Schafer's posttrial brief. We have admonished trial courts from the wholesale adoption of one party's advocacy because "the decision on review reflects the findings of the prevailing litigant rather than the court's own scrutiny of the evidence and articulation of controlling legal principles." *Rubes v. Mega Life & Health Ins. Co.*, 642 N.W.2d 263, 266 (Iowa 2002); *see also NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). Normally, when the district court incorporates verbatim a party's brief, we will "scrutinize the record more closely and carefully when performing our appellate review." *NevadaCare*, 783 N.W.2d at 465. However, because upon our de novo review we will carefully scrutinize the record in making our own findings of fact, no additional level of scrutiny is required. We reiterate, however, that a court should never abdicate its duty to independently determine facts, synthesize law, and apply the facts to the law.

**B. Background Facts and Proceedings.** Upon our de novo review, we find the following facts with additional facts set out in subsequent sections as necessary to resolve this appeal. SFI is an Iowa corporation in the business of hog and grain farming. SFI was incorporated in 1974 by Marion R. Soults (Marion). SFI is a family-run corporation. At all times relevant, Marion and his son, Bud, were responsible for SFI's operation and were SFI's only two directors. In 1991 Marion moved to Iowa Falls and became less involved in SFI's operation. Bud was responsible for SFI's day-to-day operations and maintained SFI's finances at all times relevant to this appeal. Bud was also SFI's majority shareholder during the events leading to this litigation. In 1999 Marion had a stroke. He passed away on March 15, 2000, at the age of 93.

For several years preceding Marion's death, Bud signed and publicly filed SFI's annual and biennial corporate reports with the secretary of state. The reports filed for the years 1998, 1999, 2000, and 2002 list Bud as president and secretary and Marion as vice-president and treasurer even though Marion died in 2000. SFI's attorney, Martin Fisher, maintained internal annual shareholder meeting minutes. These internal minutes stated Bud held different officer positions other than those noted in the publicly filed reports. The 1998 and 1999 shareholder minutes state Bud was elected president and treasurer and Marion was elected vice-president and secretary. The year 2000 minutes list Bud as president, treasurer, and secretary. SFI's articles of incorporation also contradicted SFI's publicly filed reports. SFI's articles of incorporation prohibited the president from serving as either vice-president or secretary. The articles also required signatures by both the president

and either the vice-president or secretary to execute a mortgage on SFI's real property.

Beginning on June 29, 1999, Schafer and Bud entered into a series of loans evidenced by promissory notes and checks. On January 18, 2000, Bud unilaterally mortgaged SFI real property to secure debt owed to Schafer in the amount of $300,000. The mortgage lists SFI as the mortgagor and is signed by Bud as "Robert Soults, Pres." At the time the mortgage was issued, Bud had two outstanding promissory notes owed to Schafer totaling $300,000. The loans continued through August 2002, totaling $440,000. None of the promissory notes or checks reference SFI. Bud signed the promissory notes "Robert Soults" and the checks were made to the order of "Robert Soults." All loan proceeds were deposited into Bud's personal checking account. Of the $440,000 in loan proceeds, $359,000 was promptly transferred into SFI's corporate account. The deposit slips substantiating Bud's transfer of funds into SFI's corporate accounts had the notation "loan repayment" on them. Bud told Schafer the loan proceeds were for farm expenses when soliciting the loans.

Tax records also indicate that Bud owed SFI substantial amounts of money. From 1996 through December 2001, Bud transferred more than $2,800,000 from his personal account into an oil investment scheme. Bud believed this scheme would make him hundreds of millions of dollars. Bud received no return on his investment. During this period of time, Bud borrowed millions of dollars from family, friends, and lending institutions. Bud secured some of the loans without fully disclosing his existing liabilities to his lenders. In 1997 Bud received a $1,000,000 loan from his cousin Don Soults (Don), and in exchange, Bud pledged his majority shares in SFI in the event of default. The loan

agreement also prohibited Bud from altering SFI's current debt ratio in the future. Bud violated the debt restriction later that year by engaging in transactions with Security State Bank (SSB).

In 1997 Bud originally executed with SSB two agricultural notes on SFI's behalf and one in his personal capacity. The notes were secured by a mortgage on SFI's farmland. The debts were restructured in 1998, resulting in a corporate SFI note for $646,787.02 and a personal note for $153,751.29. Each note was secured by two mortgages on SFI's farmland. In 2002 SSB filed a petition to foreclose the mortgages. The district court granted SSB's motion for summary judgment and our court of appeals affirmed.

On October 1, 2002, during the pendency of the SSB foreclosure proceeding, Bud abandoned SFI. His whereabouts were unknown. Pursuant to their 1997 loan agreement, Don became SFI's majority shareholder. Don lived in Virginia and had little knowledge of SFI's operations. He found SFI's corporate documents and financial records to be highly disorganized. There was little documentation to substantiate SFI's corporate activity.

In 2005 SFI commenced this case seeking to quiet title on Schafer's mortgage. Schafer filed an answer and asserted a counterclaim against SFI, and a third party claim against Bud, seeking judgment against SFI and Bud for the ten loans he made with Bud from 1999 to 2002. Schafer also sought to foreclose the mortgage. SFI replied and denied its liability for the Schafer loans, and argued Bud did not have authority to mortgage SFI real property.

On December 13, 2006, the court made its ruling in favor of Schafer. Posttrial motions were filed, including a motion filed by Schafer for attorney fees. The judgment was clarified on March 27, 2007. The

district court found SFI and Bud liable for the Schafer loans and foreclosed the mortgage. The district court awarded judgment against Bud and SFI in the amount of $436,765.92 as principal due on the loans with interest accrued to August 22, 2006, in the amount of $162,118.42 and interest accruing upon the balance at eight percent per annum. The district court also awarded Schafer $61,354.75 in attorney fees. SFI filed a notice of appeal on April 19, 2007. The appeal was transferred to the court of appeals and scheduled for hearing on June 4, 2008.

On March 18, 2008, SFI filed a petition to correct, vacate, or modify judgment or grant a new trial, based upon newly discovered evidence. The newly discovered evidence was that SFI found Bud's whereabouts and took his deposition. The pending appeal was stayed and remanded to allow the court to rule on SFI's petition. A trial was held on July 29, and the district court denied SFI's petition. SFI filed a timely notice of appeal. The district court subsequently awarded Schafer additional attorney fees incurred in defending against SFI's posttrial motion. On November 3 SFI filed a notice of appeal of the posttrial attorney fee award. SFI moved to consolidate the three appeals, and we granted the motion.

We transferred this consolidated appeal to the court of appeals. The court of appeals affirmed the district court's denial of SFI's petition to correct, vacate, or modify judgment or grant a new trial, and the district court's attorney fee awards. The court of appeals' single paragraph opinion did not purport to review the district court's original ruling. SFI filed a petition for further review, which we granted.

**C. SFI's Liability for the Schafer Loans.** SFI contends that the district court erred in holding SFI liable for the ten loans made between Schafer and Bud. The issues before us are whether Bud, in making the

loan agreements with Schafer, was acting as SFI's agent or representative and had authority to bind SFI to the loan agreements.

The loans were executed through a series of promissory notes and checks made between Schafer and Bud. Under Iowa's Uniform Commercial Code (IUCC), checks and promissory notes are negotiable instruments. Iowa Code § 554.3104 (1999); *see Allison-Kesley Ag Ctr., Inc. v. Hildebrand*, 485 N.W.2d 841, 845 (Iowa 1992) (defining a negotiable instrument to include a check). The parties agree that the agency analysis with respect to negotiable instruments under the IUCC does not substantially differ from the traditional common law agency analysis.

Iowa Code section 554.3401 governs the principal's liability when the principal's agent signs a negotiable instrument. It provides, "A person is not liable on an instrument unless . . . (ii) the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under section 554.3402." *Id.* § 554.3401(1). Iowa Code section 554.3402(1) states:

> If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract.

*Id.* § 554.3402(1). The IUCC defines representative as an "agent, an officer of a corporation or association . . . or any other person empowered to act for another." *Id.* § 554.1201(35). Taken in conjunction, the provisions state that principals are liable on instruments when the principal's agent, acting as an agent, signs the instrument and has common law authority to do so. Consequently, we must determine

whether Bud, in procuring the Schafer loans, was SFI's agent and if Bud had authority, actual or apparent, to bind SFI.

The party asserting an agency relationship must prove its existence by a preponderance of the evidence. *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 789 (Iowa 1985); *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 868, 151 N.W.2d 477, 484 (1967). "Agency . . . results from (1) manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control and, (2) consent by the latter to so act." *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977). An agency relationship can be established through the agent's actual or apparent authority to act on behalf of the principal. *Fed. Land Bank of Omaha v. Union Bank & Trust Co. of Ottumwa*, 228 Iowa 205, 209–10, 290 N.W. 512, 514–15 (1940).

The Restatement (Third) of Agency states:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

Restatement (Third) of Agency § 1.01, at 17 (2006). Pursuant to this definition, the principal and the agent must mutually manifest assent to the agency relationship before agency is created. Both parties agree that, as SFI's president, SFI manifested assent to Bud to act on its behalf in financial transactions. *Id.* § 1.01 cmt. *c*, at 19 (noting agency is "present in the relationships between . . . corporation and officer"); *see also* Iowa Code § 554.1201(35) (defining officer of a corporation to be a "representative"). SFI contends, however, that Bud did not manifest

assent to act on SFI's behalf when he obtained the loans from Schafer because Bud was acting in an individual capacity.

Logically, the scope of an agency relationship must have boundaries as a principal cannot be held liable for all actions an agent takes while going about his daily life. To this point, agency law conditions the scope of the agency relationship to transactions where the agent is acting on the principal's behalf. *See* Restatement (Third) of Agency § 1.01 cmt. *c*, at 18. "The fact that an agent acts on behalf of . . . another person implies the existence of limits on the scope of the agency relationship . . . ." *Id.* at 20. Thus, with respect to any particular transaction, agency only exists if the agent manifests its assent to "acts on behalf of" the principal in that transaction. *Id.* Stated another way, when the agent is not transacting on behalf of the principal, the principal is not liable for the agent's transactions. The precise issue before us is whether Bud manifested assent to act on SFI's behalf in procuring the Schafer loans.

SFI argues that an agent only transacts on behalf of its principal when the agent subjectively intends to bind the principal to its transaction. SFI's advocated position, however, incorrectly narrows the scope of the agency relationship. Agency does not require the agent to expressly intend his actions to bind the principal. Restatement (Third) of Agency § 1.03 cmt. *b*, at 56–57 (noting that "the relevant state of mind" in determining whether an agent assented to act on a principal's behalf "is that of the person who observes or otherwise learns of the [agent's] manifestation"); 2A C.J.S. *Agency* § 33, at 326 (2003) ("The creation of the relationship of principal and agent . . . need not be a conscious intention, but may be determined from the facts and circumstances of the particular case."). Instead, agency turns upon principal and agent

manifestations of assent, which are derived from "written or spoken words or other conduct," evaluated in context, and "often . . . inferred from surrounding facts and circumstances." Restatement (Third) of Agency § 1.03 cmt. *e*, at 62.

For example, an agent can manifest assent to act on the principal's behalf merely by performing actions the principal has empowered the agent to perform. *See id.* § 1.03 cmt. *d*, at 62 (noting that a party can make "unintended" manifestations through its actions). An agent can act on behalf of a principal by carrying out actions, which objectively benefit the principal as the agent's actions may manifest his assent to the agency relationship. Therefore, we must look to Bud's "written or spoken words or other conduct" in procuring the Schafer loans to determine whether Bud objectively manifested his assent to act on SFI's behalf in procuring the loans. *Id.* § 1.03, at 56.

SFI asserts Bud was not acting on SFI's behalf because the Schafer loans refer only to "Robert Soults" with no reference to SFI, and the loan proceeds were all initially deposited into Bud's personal accounts and marked as loan repayment. This argument is undercut in part, however, by the fact that Bud and SFI were closely interwoven. SFI is a family-run corporation. Bud, as president, had unfettered autonomy to operate SFI during the years the Schafer loans were procured. SFI paid insufficient attention to corporate formalities evidenced by Bud's numerous money transfers between corporate and personal accounts without adequate documentation. Bud also lived at SFI's headquarters.

We also find the record establishes that Schafer clearly believed, pursuant to Bud's representations, that Bud needed the loan proceeds to operate SFI. Schafer was highly skeptical of Bud's oil investments and informed Bud on multiple occasions that he would not loan Bud money

for the investment scheme. Bud told Schafer the money was for "normal expenses like fuel, fertilizer, and labor." On one occasion, Bud told Schafer he needed capital because he was late in paying his farmhands. The loans were short term, either due in several months or on demand, which evidences that the loans were intended to provide SFI with operating capital. Finally and importantly, of the $440,000 in loans provided to Bud, Bud promptly transferred $359,000 into SFI's corporate account.

In sum, Bud and SFI were closely interwoven entities. Bud secured the Schafer loans by promising to use the loan proceeds for SFI's farming operation, the loans were consistent with short-term capital loans, and the great majority of the loan proceeds were indeed used for SFI's farming operations. We find that Bud's conduct in obtaining the loans and his use of the loan proceeds demonstrate Bud manifested his assent to act on SFI's behalf in obtaining the Schafer loans. Thus, Schafer has established that Bud was SFI's agent when procuring the Schafer loans. Next, we must determine whether Bud had authority to procure the loans on SFI's behalf.

Actual authority exits if the principal has either expressly or by implication granted the agent the authority to act on the principal's behalf. *Grismore v. Consol. Prods. Co.*, 232 Iowa 328, 335, 5 N.W.2d 646, 651 (1942). Actual authority is composed of two authority classifications, one known as "express authority" and the other known as "implied authority." *Id.* Express authority exists where there is direct evidence the principal granted authority to the agent to act on its behalf. *Id.* Where circumstantial evidence proves the agent's authority, however, the authority is implied. *Id.*

We have held the president of a corporation has authority

> to bind a corporation to the payment of a promissory note is not to be implied from the mere fact that the person assuming to represent [the corporation] is its president, yet such authority may be found in the fact that the corporate business has been intrusted to his management and control.

*Citizens' Bank v. Pub. Drug Co.*, 190 Iowa 983, 988, 181 N.W. 274, 277 (1921); *see also Hobbs v. Homes, Inc.*, 246 Iowa 1195, 1206, 71 N.W.2d 592, 599 (1955) (finding sufficient evidence of control to create fact question as to whether president had implied authority to bind corporation); 19 C.J.S. Corporations § 553, at 41 (2007) (noting the president is frequently the controlling officer and accordingly has many implied powers). We have also stated that a president's implied authority is limited to actions incidental to his corporate duties and the president's actions must be within the ordinary course of the business. *Newberry v. Barth Inc.*, 252 N.W.2d 711, 714 (Iowa 1977); *White v. Elgin Creamery Co.*, 108 Iowa 522, 526, 79 N.W. 283, 284 (1899).

In *Citizens' Bank*, we held the president, director, and manger of a family-run corporation had authority to bind the corporation to promissory notes. *Citizens' Bank*, 190 Iowa at 988, 181 N.W. at 276. The family corporation had two other directors, the president's wife and doctor, neither of whom were active in the business. *Id.* at 986, 181 N.W. at 276. The president had complete autonomy to operate the corporation. *Id.* We noted that

> [i]n such case it would be a gross miscarriage of justice if, when the family corporation is called upon to perform contracts made by its head and manager in its name, its creditors should be held remediless because [no] provision in the articles of incorporation or by-laws . . . authoriz[ed] the act done by the president and manager.

*Id.* at 988, 181 N.W. at 277.

Similarly, Bud was the president, director, and manager of SFI when the Schafer loans were procured. SFI's only other officer and director was Marion. Marion had little involvement with SFI at the time the Schafer loans were procured and died before many of the loans were made. SFI's other shareholders consisted of Bud's two sisters and a cousin, none of whom had involvement in SFI's day-to-day operations. Thus, Bud had complete autonomy to manage SFI. Moreover, Bud represented to Schafer he needed short-term loans to infuse capital into SFI to pay for basic farming operation expenses. The president's decision to procure capital for the corporation's standard operating expenses surely is an action incident to the nature of a corporate manager and within a corporation's usual course of business. SFI gave Bud unfettered discretion to manage SFI during the time period the Schafer loans were obtained, and obtaining $440,000 in short-term capital for a 2500 acre farm corporation strikes us as a task incident to the management of a farm corporation. Thus, we find SFI gave Bud actual authority in the form of implied authority to procure capital on SFI's behalf.

Therefore, we find SFI is liable for the Schafer loans because Bud was acting as SFI's agent in obtaining the Schafer loans and Bud had actual authority to obtain the loans on SFI's behalf.[1]

**D. Bud's Authority to Execute the Mortgage on Behalf of SFI.** SFI also contends Bud did not have authority to convey a mortgage on SFI's real property to Schafer to secure the loans. The mortgage, executed on January 18, 2000, identified the mortgagor as SFI, and Bud signed the mortgage as SFI's president. SFI contends Bud did not have

---

[1]The parties spend some time briefing whether SFI was a disclosed or undisclosed principal; however, because we find Bud had actual authority, we need not address the issue as actual authority can bind both disclosed and undisclosed principals. Restatement (Third) of Agency §§ 6.01, 6.03 at 3, 39 (2006).

authority to unilaterally convey real property on SFI's behalf because SFI's publicly recorded articles of incorporation require two separate officer signatures to convey SFI's real property. Schafer in his counterclaim, however, asserts issue preclusion prevents this court from considering the issue. Schafer claims this issue was litigated and decided in previous litigation between SSB and SFI.

In 1997, Bud, as president, executed two notes with SSB on SFI's behalf and one in his personal capacity. Bud secured these notes with a mortgage on SFI's real property. In 1998, SSB renegotiated both the corporate and personal obligations which resulted in two mortgages on the same SFI real property, one securing SFI's corporate note and one securing Bud's personal note. Bud defaulted on the loans, and, in June 2002, SSB brought a mortgage foreclosure action against SFI and Bud. SSB filed a motion for summary judgment alleging Bud had authority to convey the mortgage to SSB in 1998. SFI sought and obtained two continuances of the summary judgment hearing so it could gather evidence to resist the motion. The motion was heard in January 2003, and in its resistance SFI argued Bud had no authority to pledge SFI's real property as collateral for his personal note. SFI, however, did not argue Bud lacked authority because he unilaterally conveyed a mortgage on SFI's real property in violation of Article IV of SFI's Articles of Incorporation—the argument made in this case. The district court found Bud had actual authority to convey a mortgage on SFI's real property to secure his personal note.

Schafer seeks to use issue preclusion offensively in the present action. Schafer argues we should give the judgment from the SSB litigation holding Bud had authority to unilaterally mortgage SFI real

property preclusive effect. We have previously explained issue preclusion as follows:

> [T]he doctrine of issue preclusion prevents parties to a prior action in which judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

*Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981) (quoting Restatement (Second) of Judgments § 68 (Tentative Draft No. 4, 1977) (now Restatement (Second) of Judgments § 27 (1982)) (footnote omitted).

The doctrine of issue preclusion can be used defensively or offensively. *Fischer v. City of Sioux City*, 654 N.W.2d 544, 546–47 (Iowa 2002). When used in an offensive manner, the plaintiff in the second action relies upon a former judgment against the defendant to establish an element of his or her claim. *Id.* at 547. We have determined issue preclusion applies irrespective of the parties' mutuality or privity. *Hunter*, 300 N.W.2d at 123, 125. The party asserting issue preclusion must establish four elements:

> (1) the issue in the present case must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior case, and (4) the determination of the issue in the prior action must have been essential to the resulting judgment.

*Fischer*, 654 N.W.2d at 547 (citing *Hunter*, 300 N.W.2d at 123). When issue preclusion is invoked offensively, two additional considerations are present:

> (1) whether the opposing party in the earlier action was afforded a full and fair opportunity to litigate the issues . . ., and (2) whether any other circumstances are present that would justify granting

the party resisting issue preclusion occasion to relitigate the issues.

*Id.*; *see also Hunter*, 300 N.W.2d at 126 (citing Restatement (Second) of Judgments § 88 (Tentative Draft No. 2, 1975) (now Restatement (Second) of Judgments § 29)). We now proceed to examine whether Schafer can establish the elements necessary to invoke issue preclusion.

1. *Same issue.* We start by noting that the same issue is presented "if the question [at issue] is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action." Restatement (Second) of Judgments § 27 cmt. *c*, at 253. The SSB litigation concerned a 1998 mortgage, executed by Bud unilaterally on SFI's behalf. In the SSB litigation, SSB alleged Bud had authority to execute such a mortgage on SFI's behalf. In the present case, we are asked to decide whether Bud had authority to unilaterally mortgage SFI real property in 2000.

SFI contends the issues are not the same because there are factual variations between the SSB mortgage and the Schafer mortgage. First, SFI argues the SSB mortgage and the Schafer mortgage are different because of the two year time difference between the mortgages. In essence, SFI asserts the same issue is not presented because the issues involve separate transactions. Second, SFI asserts we are confronted with a different issue in the present case because Schafer's mortgage purports to secure a promissory note that does not exist. Neither of these variations alter the issue presented in the SSB litigation or this case—Does Bud have unilateral authority to mortgage SFI property? The two year time difference is only relevant if SFI possessed different corporate characteristics material to Bud's authority in 1998 and 2000. SFI's second variation goes toward whether the mortgage was invalid

because it failed to secure an obligation, and not whether Bud had authority to unilaterally mortgage SFI property.

SFI was essentially the same company in 1998 as it was in 2000. In 2000, SFI's articles of incorporation and filings with the secretary of state remain unchanged from its 1998 documents. In 2000, the biennial report listed Bud as president, treasurer, and secretary, just like the 1998 report did. In both years, the biennial report conflicted with the publicly disclosed articles of incorporation and SFI's internal minutes. Bud retained complete managerial autonomy of SFI in both 1998 and 2000. While the SSB and Schafer mortgages were executed in separate transactions, the circumstances that bear on Bud's authority to unilaterally mortgage SFI property are nearly identical. The primary issue raised by both the SSB litigation and this lawsuit is whether Bud had authority to unilaterally mortgage SFI property. We find the issue raised in this appeal to be the same issue presented in the SSB litigation.

2. *Raised and litigated requirement.* An issue is raised and litigated when submitted for determination through a " 'motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment, a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict.' " *Bascom v. Jos. Schlitz Brewing Co.*, 395 N.W.2d 879, 884 (Iowa 1986) (quoting Restatement (Second) of Judgments § 27 cmt. *d*, at 255).

SSB filed a motion for summary judgment alleging Bud had authority to unilaterally mortgage SFI's real property. SFI sought two continuances and properly resisted SSB's motion. After the district court granted summary judgment against SFI, SFI unsuccessfully appealed the ruling. SFI raised and litigated the issue of Bud's authority in the prior

case and found Bud had the authority to bind SFI when he signed the mortgage.

In the present case, SFI contends Bud did not have the authority to sign the mortgage. SFI raises another theory for its argument—that Bud lacked authority because SFI's articles of incorporation require the signature of two officers to convey SFI real property. SFI did not raise the articles of incorporation theory in the SSB litigation. However, "if the [previously litigated] issue was one of law [or ultimate fact], new arguments may not be presented to obtain a different determination of that issue." Restatement (Second) of Judgments § 27 cmt. *c*, at 253; *see also DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir. 1992) (holding prior litigation against a defendant, where the court found against the plaintiff on the ultimate fact, is preclusive against the plaintiff in a subsequent action against another defendant).

Illustration 6 to comment *c* demonstrates this principle. It provides:

> A brings an action against B to recover an installment payment due under a contract. B's sole defense is that the contract is unenforceable under the statute of frauds. After trial, judgment is given for A, the court ruling that an oral contract of the kind sued upon is enforceable. In a subsequent action by A against B to recover a second installment falling due after the first action was brought, B is precluded from raising the statute of frauds as a defense, *whether or not on the basis of arguments made in the prior action,* but is not precluded from asserting as a defense that the installment is not owing as a matter of law on any other ground.

Restatement (Second) of Judgments § 27 cmt. *c*, illus. 6 at 254 (emphasis added).

SFI's argument in the present case, that Bud did not have the authority to sign a mortgage is the exact same issue of ultimate fact

raised by SFI, when it defended the foreclosure action brought by SSB. SFI did not raise the articles of incorporation theory in its litigation with SSB, even though it had the opportunity to do so. Therefore, under the doctrine of issue preclusion, SFI is precluded from relitigating Bud's authority to sign a mortgage, even though it may have a different theory for making that argument in this action. Accordingly, this element of issue preclusion is satisfied.

3. *Material and relevant.* In the SSB mortgage foreclosure proceeding, the dispositive issue was whether Bud had authority to unilaterally mortgage SFI's real property on its behalf. The issue was material and relevant to the prior action.

4. *Determination of issue essential to judgment.* Bud's authority was the dispositive issue in the SSB mortgage foreclosure proceedings. Thus, its resolution was essential to the judgment.

5. *Additional offensive issue preclusion considerations.* We look critically at a plaintiff's offensive use of issue preclusion because it forecloses an element of the plaintiff's claim adversely to the defendant based upon the prior litigation. *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 203 (Iowa 2003). SFI does not claim it was denied a "full and fair opportunity" to litigate Bud's authority in the SSB case. SFI asserts only that the circumstances surrounding the SSB litigation justify not giving preclusive effect to the judgment in that case. SFI points out that it was going through a significant leadership transition during the pendency of the SSB litigation. SSB filed its petition in June 2002. On October 1, 2002, Bud abandoned SFI and Don became the majority owner. Don had no knowledge of the pending litigation or the financial condition of SFI. As a result of this leadership change, SFI's representative counsel withdrew from the SSB litigation.

SFI retained new counsel on October 15, and SFI claims new counsel had to file a hurried resistance to SSB's summary judgment motion. SFI's new counsel filed its resistance on November 25.

We find these circumstances do not justify disposing of the prior judgment's preclusive effect. First, we are unconvinced new counsel was forced to hastily file a resistance. Since 1974, SFI's articles of incorporation have been publicly filed and the relevant portions have not been modified. If SFI wanted to assert its articles of incorporation denied Bud the authority to unilaterally mortgage SFI's real property, then that theory was readily available. Moreover, SFI's new counsel sought and received two continuances to continue discovery before filing its resistance. SFI's new counsel took forty-one days to perform discovery and file a two-page resistance.

Second, SFI argues "other circumstances" are mitigating factual reasons as to why it did not raise a specific theory in the prior litigation. The "other circumstances" element, however, primarily protects defendants from the offensive use of issue preclusion when the prior proceeding is unreliable because of legal procedure or changed legal circumstances. *See Hunter*, 300 N.W.2d at 126 (finding plaintiff's failure to effectuate joinder, when easily done, in prior suit prevents plaintiff from now asserting offensive issue preclusion); 18 Charles A. Wright, et al., *Federal Practice and Procedure* § 4416, at 393 (2d ed. 2002) (noting issue preclusion is appropriate when there are no "special considerations of fairness, relative judicial authority, changes of law, or the like").

For example, the Restatement (Second) of Judgments § 28 provides the following exceptions to the application of issue preclusion: (1) the prior judgment was not susceptible to appellate review, (2) intervening change in the applicable law, (3) differences in quality, extensiveness, or

jurisdiction or the two courts, (4) the party whom preclusion is sought had a significantly heavier burden of persuasion in the former action, and (5) the latter action was not sufficiently foreseeable at the time of the initial action or the party did not have proper incentive to obtain a full and fair adjudication in the initial action. Restatement (Second) of Judgments § 28, at 273–74. SFI's mitigating factual reasons as to why SFI did not articulate a particular theory when previously litigating Bud's authority are not the type of circumstances that normally strip a judgment of its preclusive effect.

We agree with the district court that Schafer has established all elements necessary to invoke offensive issue preclusion. Thus, we give preclusive effect to the judgment in the SSB case. Bud had authority to unilaterally mortgage SFI's real property on SFI's behalf.

**E. Adequate Consideration for the Schafer Mortgage.** SFI contends the Schafer mortgage was supported by inadequate consideration and is void. A mortgage must be supported by bargained-for consideration. *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26–27 (Iowa 1997). Consideration may be "either a benefit to the promisor or a detriment to the promisee." *Id.* at 27. Consideration may consist of an antecedent or preexisting debt without any new consideration when the mortgage is conveyed. *Peoples Bank & Trust Co. of Cedar Rapids v. Lala*, 392 N.W.2d 179, 184 (Iowa Ct. App. 1986).

Bud mortgaged SFI's real property to forbear Schafer from attempting to collect on the $300,000 in preexisting debt. The mortgage also gave Schafer the requisite security he needed to loan SFI money in the future. The mortgage secured preexisting debt, caused Schafer to forebear from collecting on prior loans, and incentivized Schafer to continue to loan to SFI. Schafer received security in exchange for his

loans and his promise to refrain from collecting on past due notes. SFI received loan payments. The mortgage was supported by bargained-for consideration.

**F. Interpretation and Reformation of the Mortgage.** SFI contends the Schafer mortgage is not enforceable because the mortgage purports to secure a promissory note that does not exist. *See* Restatement (Third) of Property: Mortgages § 1.1 cmt., at 9 (1997) ("Unless it secures an obligation, a mortgage is a nullity."). We are tasked with determining which loans, if any, the parties intended the mortgage to secure. A mortgage is subject to the principles of interpretation and construction that govern contracts generally. *Freese Leasing, Inc. v. Union Trust & Sav. Bank*, 253 N.W.2d 921, 924 (Iowa 1977). These principles are designed to identify the intentions of the parties. *Id.*

When considering extrinsic evidence, we have stated:

> Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract "can almost never be plain except in a context." Accordingly,
>
>> "[a]ny determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. *But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.*"
>
> In other words, although we allow extrinsic evidence to aid in the process of interpretation, the words of the agreement are still the most important evidence of the party's intentions at the time they entered into the contract. When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among

reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact.

*Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (citations omitted) (quoting *Fausel v. JRJ Enters. Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)).

The mortgage refers to a promissory note dated September 18, 1998, in the principal amount of $300,000, with a due date of October 31, 1999. Both parties agree no note was executed on September 18, 1998. Nonetheless, upon our de novo review, we find the parties' intended the mortgage to secure $300,000 in pre-existing debt SFI owed to Schafer, which was due on October 31, 1999. In July 1999 Schafer loaned Bud $25,000, and in September 1999 Schafer loaned Bud an additional $275,000. The July loan was due on October 31 with no year indicated, and the September loan was due on October 31, 1999, which matches the due date indicated in the mortgage. Substantively, the note described in the mortgage and the notes that actually existed were identical in principal and due date.

SFI's corporate counsel, Fisher, drafted the mortgage based upon information Bud and Schafer orally communicated to him. There was no formal conference between all parties, and Fisher had minimal recollection of the transaction. Also, because of conflicts, Fisher acted only as a scrivener and did not represent either party. Schafer was not heavily involved in the mortgage's preparation. Upon the mortgage's completion, Schafer checked to ensure the mortgage contained the correct principal amount. The mortgage's third line reflects the principal amount secured; however, the incorrect date does not appear until near the bottom of the mortgage's first page.

Bud and Schafer's lending agreements were informal, often with minimal documentation, and Bud did not keep detailed or organized financial records. The preparation of the mortgage was hasty and done without representation. It is not surprising the mortgage contains incorrect nonsubstantive details about the notes. Critically, the mortgage reflects the accurate principal debt owed and date the notes were due. It cannot be a coincidence the substantive provisions of the imaginary September 18, 1998 promissory note matches the substantive provisions of the July and September notes—which total the debt SFI owed Schafer at the time the mortgage was executed. We find the parties intended the mortgage to secure the two notes.

"Before equity will reform an agreement 'a definite intention or agreement on which the minds of the parties had met must have preexisted the instrument in question.' " *Sun Valley Iowa Lake Ass'n v. Anderson,* 551 N.W.2d 621, 636 (Iowa 1996) (quoting 66 Am. Jur. 2d *Reformation of Instruments* § 4, at 529 (1973)). Where there has been a mistake, whether mutual or unilateral, in the expression of the contract, reformation is the proper remedy. *Nichols v. City of Evansdale*, 687 N.W.2d 562, 570 (Iowa 2004); *accord Merle O. Milligan Co. v. Lott*, 220 Iowa 1043, 1046, 263 N.W. 262, 263–64 (1935).

We find it was Bud and Schafer's intent for the mortgage to secure the $300,000 debt owed to Schafer as of January 18, 2000, as well as the future advances. The parties mistakenly characterized the outstanding debt as being derived from a single promissory note dated September 18, 1998. Thus, Bud and Schafer merely failed to accurately express their contractual agreement. The drafting mistake does not undermine the parties agreed upon exchange of performances. Therefore, reformation of the parties' inaccurate expression of their

agreement does not revise, modify, or alter the parties' agreement, but only reforms the mortgage to reflect the parties' actual intent. The district court correctly reformed the mortgage to reflect Schafer and Bud's actual intent.

**III. SFI's Petition to Vacate Judgment Because of New Evidence**.

**A. Scope of Review.** In this consolidated appeal, we are also tasked with ruling on the district court's denial of SFI's petition to correct, vacate, or modify judgment or grant a new trial based upon newly discovered evidence. We give the district court wide discretion in ruling on such petitions, and an abuse of discretion is needed for reversal. *Embassy Tower Care v. Tweedy*, 516 N.W.2d 831, 833 (Iowa 1994) (citing *Kreft v. Fisher Aviation, Inc.*, 264 N.W.2d 297, 303 (Iowa 1978)); *Cook v. Cook*, 259 Iowa 825, 829, 146 N.W.2d 273, 275 (1966); *Windus v. Great Plains Gas*, 255 Iowa 587, 594, 122 N.W.2d 901, 905 (1963). We are more reluctant to reverse the district court when it has vacated its prior judgment than when it refuses to grant relief. *Kreft*, 264 N.W.2d at 303; *Windus*, 255 Iowa at 594, 122 N.W.2d at 905.

**B. Timeliness of SFI's Petition.** SFI brought its petition on March 19, 2008, pursuant to Iowa Rule of Civil Procedure 1.1012(6). A rule 1.1012 petition is timely if it is filed "within one year after the entry of the judgment or order involved." Iowa R. Civ. P. 1.1013(1). The district court entered its original ruling on December 13, 2006. Both parties filed timely posttrial motions, which the district court decided on March 27, 2007. In its order, the district court clarified its original ruling and judgment. SFI's petition is not within one year of the district court's original ruling, but it is within one year of the district court's

ruling on the posttrial motions. Schafer contends SFI had to file its petition within one year of the original ruling.

Pursuant to rule 1.1012, "the court may correct, vacate, or modify a final judgment." Iowa R. Civ. P. 1.1012. Rule 1.1013(1) states, a rule 1.1012 petition is timely filed "within one year after the entry of the judgment or order involved." *Id.* r. 1.1013(1). If a party timely files a valid posttrial motion, then the district court's preceding judgment is deemed an interlocutory judgment until the motion is decided. *IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 628 (Iowa 2000); *Wolf v. City of Ely*, 493 N.W.2d 846, 848 (Iowa 1992); *see* also *In re Marriage of Okland*, 699 N.W.2d 260, 265–66 (Iowa 2005) ("[A]n untimely or improper rule 1.904(2) motion does not extend the time for filing an appeal." (footnote omitted)). Interlocutory judgments are not final rulings in a matter, and only when the district court resolves the posttrial motion is the judgment no longer interlocutory, but final. *IBP*, 604 N.W.2d at 627–28.

The parties' valid and timely posttrial motions made the district court's December 13, 2006 judgment interlocutory. The district court did not rule on the posttrial motions until March 27, 2007. Thus, the district court did not enter final judgment in the matter until March 27. SFI filed its petition on March 19, 2008, which is within one year of final judgment. Thus, SFI timely filed its petition to correct, vacate, or modify judgment or grant a new trial.

**C. Merits.** SFI brought its petition after it located and deposed Bud posttrial. SFI found Bud in an assisted living facility in California as a ward of the state. Bud had been living in a California motel before suffering a stroke. Bud could not articulate full sentences and could only answer leading questions that almost always called for a yes or no response. Bud stated his memory was "pretty good." During the

deposition, Bud repeatedly stated he intended the Schafer loans to be personal. Bud also emphatically stated he did not sign the Schafer mortgage. Moreover, Bud testified he knew the SFI articles of incorporation required two officer signatures to convey real estate.

A fair amount of Bud's testimony, however, is unquestionably contradicted by other admitted evidence including Bud's statements that: (1) he did not sign the Schafer mortgage, (2) he did not direct Fisher to prepare the Schafer mortgage nor provide Fisher with information, (3) he prepared SFI's shareholder minutes not Fisher, (4) his sisters attended SFI's annual shareholder meetings, and (5) Schafer never discouraged him from investing in the oil scheme. Additionally, Bud admitted that much of the proceeds from the Schafer loans went to SFI's farm expenses.

SFI argues the petition should be granted because Bud's deposition shows: (1) Bud was not acting as SFI's agent in procuring the Schafer loans because Bud intended the loans to be personal, and (2) Bud did not have authority to unilaterally convey SFI's real property because he knew SFI's articles of incorporation required two signatures. The district court denied SFI's petition finding Bud's testimony to lack credibility and because the deposition failed to refute the evidence the court relied upon in its earlier decision.

SFI contends Bud's testimony shows that he intended the Schafer loans to be personal loans, not loans binding on SFI. Thus, Bud was not acting as SFI's agent in obtaining the loans. The testimony may help corroborate that Bud subjectively believed he was not acting as SFI's agent in obtaining the Schafer loans. We rejected earlier, however, the notion that agency turns upon the agent's subjective intent. Instead, we concluded that agency exists when the agent manifests his assent to act

on behalf of his principal. This inquiry does not turn on the agent's subjective recognition of agency, but whether the agent objectively took actions for the purpose of benefiting the principal. We found the evidence in the original trial showed Bud manifested assent to act on SFI's behalf in obtaining the loans. Bud's testimony as to his subjective intent does alter this conclusion. With respect to Bud's authority to unilaterally convey SFI real estate, we held the judgment in the SSB case must be given preclusive effect. Bud's testimony does not alter our issue preclusion analysis.

We will reverse a court's discretionary ruling only when the court rests its ruling on grounds that are clearly unreasonable or untenable. *Gabelmann v. NFO, Inc.*, 606 N.W.2d 339, 342 (Iowa 2000). We find Bud's testimony lacked credibility. Bud's deposition was riddled with inconsistencies and his conduct over the past decade has been less than reputable. Moreover, Bud's testimony does not undermine our prior analysis of SFI's loan and mortgage liability. Therefore, the district court did not abuse its discretion in denying SFI's petition to correct, vacate, or modify judgment or grant a new trial.

**IV. Attorney Fees.**

**A. Scope of Review.** We review a district court's award of attorney fees for an abuse of discretion. *NevadaCare, Inc.*, 783 N.W.2d at 469.

**B. Merits.** The district court awarded Schafer attorney fees for the original trial and fees incurred in resisting SFI's petition to correct, vacate, or modify judgment or grant a new trial. Schafer also asserts he is entitled to an award of appellate attorney fees for costs incurred in defending the trial court's rulings in this consolidated appeal.

Five of the promissory notes and the mortgage contain a clause providing Schafer attorney fees incurred in enforcing his right to payment and mortgage foreclosure. Iowa Code section 625.22 states, "[w]hen judgment is recovered upon a written contract containing an agreement to pay an attorney's fee, the court shall allow and tax as a part of the costs a reasonable attorney's fee to be determined by the court." Iowa Code § 625.22.

SFI's only argument against the award of attorney fees is that SFI is not liable for the Schafer loans and the mortgage is invalid or void. We have rejected these arguments. Because we have found Schafer can enforce the loans and mortgage against SFI, Schafer is entitled to reasonable attorney fees and expenses pursuant to section 625.22.

Therefore, the award of attorney fees by the district court was not clearly unreasonable or untenable. Consequently, we affirm the district court's attorney fee awards, and award reasonable appellate attorney fees and expenses. The record is insufficient to determine a reasonable appellate attorney fee award. Therefore, we remand this case to the district court to award Schafer reasonable appellate attorney fees and expenses.

## V. Disposition.

We find SFI is liable for the Schafer loans, and Bud had authority to execute the Schafer mortgage. Moreover, the mortgage is supported by adequate consideration, and the district court properly interpreted and reformed the mortgage to reflect the parties' intent. The district court did not abuse its discretion in denying SFI's petition to correct, vacate, or modify judgment or grant a new trial or awarding Shafer attorney fees relating to the trial, his resistance to Schafer's posttrial motions, and this appeal. We affirm the court of appeals' decision, we

affirm the district court, and we remand the case to the district court to award Schafer reasonable appellate attorney fees.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED, AND CASE REMANDED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who take no part.